# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMAGINE THAT INTERNATIONAL, INC., a California corporation dba ALL FOUR PAWS,<br><br>                    Plaintiff,<br><br>    v.<br><br>CS TECH US, a Nevada corporation dba ZenPet and ZenPetUSA.com, CS TECH MEXICO, S.A. de C.V., a foreign corporation, CHAD GIBSON, an individual, JEN BARRELLI, an individual, HECTOR D. CAMPA, an individual, and DOES 1-10, inclusive,<br><br>                    Defendant. | CASE NO. 3:15-cv-1558-GPC-WVG<br><br>**ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE, AND REQUEST FOR EXPEDITED DISCOVERY**<br><br>[ECF No. 5] |

## I. INTRODUCTION

On July 16, 2015, Plaintiff Imagine That International, Inc., dba All Four Paws, ("Plaintiff") filed an Ex Parte Application for Temporary Restraining Order, Order to Show Cause, and Request for Expedited Discovery. (ECF No. 5.) Defendants CS Tech US, dba ZenPet and ZenPetAUSA.com ("CS Tech"), CS Tech Mexico S.A. de C.V. ("CS Tech Mexico"), Chad Gibson ("Chad Gibson"), Jen Barrelli ("Barrelli"), and Hector D. Campa ("Campa") (collectively, "Defendants") oppose. (ECF No. 8.) Specifically, Plaintiff seeks three things: (1) a temporary restraining order (a "TRO")

preventing Defendants from "displaying, offering to sell and selling the infringing products at the upcoming SuperZoo show in Las Vegas on July [21–23[1]], 2015"; (2) an order to show cause why the TRO should not be converted to a preliminary injunction; and (3) expedited discovery to "confirm the identity of the Mexican manufacturer, find out how much inventory has already been imported and where it has gone, how much more remains, and the extent to which defendants Gibson and Barrelli were executing their plan for CS Tech US even while they were employed by Contech." (ECF No. 5-1, at 4, 21, 24.) A hearing was held on Plaintiff's Ex Parte Application on July 20, 2015. (ECF No. 10.)

## II. FACTUAL BACKGROUND

Plaintiff is the holder of two regular patents and one design patent on flexible pet protective collars: (1) U.S. Patent No. 8,042,494 (the "'494 patent") titled "pet protective collar" which discloses a "custom fittable collar for an animal, useful to prevent the animal from contacting injured areas on the body, thus promoting healing of wounds"; (2) U.S. Patent No. 8,720,386 (the "'386 patent") titled "pet protective collar with stays" which discloses a "flexible pet protective collar having stays formed of a more rigid material than flexible sheets of the collar, the stays being disposed inside channels located at seams of the collar"; and (3) U.S. Design Patent No. 705,502 (the "D'502 patent") which discloses an "ornamental design for a pet protective collar." (ECF No. 1 ¶ 15; ECF No. 1-2, Exs. 1–3.) Plaintiff alleges that Defendants' ProCone/ZenCone products infringe all three patents. (ECF No. 1 ¶ 103.)

In 2012, Plaintiff previously sued Contech, the former maker of the ProCone over infringement of these patents. (*Id.* ¶ 27.) The case settled and resulted in a license of the patents to Contech. (*Id.*) In 2014, Contech filed for bankruptcy. (*Id.* ¶ 36) Plaintiff alleges that Defendants Chad Gibson and Barrelli "owned, ran, were employed

---

[1] Plaintiff's papers have at times referred to the SuperZoo show as occurring on July 23–25, 2015, (*see, e.g.*, ECF No. 5-1, at 4), and on July 21–23, 2015, (*see, e.g.*, ECF No. 5, at 1). The Court notes that the correct dates are July 21–23, 2015. *See* SUPERZOO, http://www.superzoo.org (last visited July 17, 2015).

by, or were otherwise affiliated with a California corporation G&B Marketing, Inc. ('G&B')." (ECF No. 5-1, at 2.) Plaintiff alleges that, in 2011, Contech acquired G&B and Chad Gibson and Barrelli "became employed by Contech."[2] (*Id.*) Plaintiff alleges that CS Tech acquired ProCone inventory from Contech's bankruptcy and that Chad Gibson and Barrelli are now employees of CS Tech. (*Id.* ¶¶ 64, 66.) Plaintiff alleges that CS Tech now sells ProCones under the name "ZenCone." (*Id.* ¶ 86) Plaintiff alleges that, though there was an initial drop off in ProCone inventory after the bankruptcy, inventory has since been restocked, starting in mid to late-June 2015. (*Id.* ¶¶ 59–60.) Plaintiff has terminated its license to Contech and is now suing Defendants over their sale of ProCones/ZenCones, alleging patent infringement and unfair competition. (*Id.* ¶¶ 50, 126–145.)

### III. LEGAL STANDARD

The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The legal standard that applies to a motion for a TRO is the same as a motion for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). To obtain a TRO or preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the Ninth Circuit's "sliding scale" approach,"serious questions" going to the merits and a balance of hardships that "tips sharply" in favor of the movant are can support injunctive relief so long as the other two elements are also met. *Alliance for the*

---

[2] At oral argument, Defendants disputed this, alleging that Chad Gibson and Barrelli had never been employed or otherwise affiliated with Contech. (ECF No. 10.)

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22, and the moving party bears the burden of meeting all four *Winter* prongs. *See Cottrell*, 632 F.3d at 1135; *DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011).

## IV. DISCUSSION

**A. Likelihood of Success on the Merits**

The first factor is whether Plaintiff has shown a likelihood of success on the merits. *Winter*, 555 U.S. at 20. Plaintiff asserts four causes of action in this case, three for patent infringement and one for unfair competition. (ECF No. 1 ¶¶ 126–145.)

**1. Patent Infringement**

Plaintiff alleges that Defendants' ProCone/ZenCone product infringes Claim 1 of the D'502 patent, Claim 9 of the '386 patent, and Claim 13 of the '494 patent. (ECF No. 1 ¶¶ 127, 132, 137; ECF No. 5-1, at 7, 11.) Relying on the presumptive validity of issued patents, Plaintiff also argues that the patents-in-suit are valid. (ECF No. 5-1, at 13–14.) Defendants respond that: (1) they are protected by the first sale doctrine, (2) the patents-in-suit are invalid based on prior art, (3) the allegedly infringing products do not infringe Claim 1 of the '494 patent because they do not contain the required "flexible resilient padding layer," '494 Patent, at 8:24.[3] (ECF No. 8, at 4–9.) However, Defendants only evidence that there is no "flexible resilient padding layer" is the declaration of Defendants' counsel and Defendants do not provide an example or description of the allegedly infringing products. (*See* ECF No. 8-1 ¶ 9.[4]) Additionally,

---

[3] Though Plaintiff alleges that Defendants' product infringes *Claim 13*, not Claim 1 which Defendants' argument is based on, the Court notes that the Defendants' argument equally applies to Claim 13 because the "flexible resilient padding layer" is a required element of both Claim 1 and Claim 13. *See* '494 Patent, at 8:24–30, 10:25–31.

[4] The Court also notes that, while Defendants' brief argues that the "flexible resilient padding layer" is missing from the allegedly infringing products, (ECF No. 8, at 8–9), the declaration that Defendants cite to support that argument only states that "a limitation" from Claim 1 of the ''494 patent is missing, but does not actually specify

1  Defendants do not respond to Plaintiff's arguments regarding the D'502 or '386
2  patents. (*See* ECF No. 8.)
3       First, Defendants argue that the first sale/patent exhaustion doctrine protects
4  them because they acquired the ProCones from Contech who had a license from
5  Plaintiff. (ECF No. 8, at 4–6.) While there may be some merit to the argument that the
6  first sale doctrine may protect Defendants' sale of the approximately 38,000 ProCones
7  Defendants acquired from Contech, *see Quanta Computer v. LG Electronics*, 553 U.S.
8  617 (2008), Plaintiff argues and presents some evidence indicating that Defendants will
9  be selling new ZenCones, (*see* ECF No. 1 ¶¶ 86–87; ECF No. 5-2 ¶ 43). Indeed,
10 Defendants' counsel stated at oral argument that Defendants would likely need to
11 produce more ZenCones based on any orders received from SuperZoo. (ECF No. 10.)
12 Thus the Court finds that the first sale doctrine has little application to Plaintiff's Ex
13 Parte Application because Defendants have stated that they are seeking not only to sell
14 the ProCones purchased from Contech but to sell additional ProCones/ZenCones as
15 well, and any newly made ProCones/ZenCones would not be covered by the license
16 and, hence, the first sale doctrine.
17      Second, Defendants argue that all three patents are invalid in light of prior art,
18 primarily the Trimline Veterinary Recovery Collar. (*See* ECF No. 8-1, Ex. C.) "A
19 patent is invalid if an alleged infringer proves, by clear and convincing evidence, that
20 the differences between the claimed subject matter and the prior art are such that the
21 subject matter as a whole would have been obvious at the time the invention was made
22 to a person having ordinary skill in the pertinent art." *Otsuka Pharm. Co. v. Sandoz,*
23 *Inc.*, 678 F.3d 1280, 1290 (Fed. Cir. 2012) (citing 35 U.S.C. §§ 103(a), 282(2);
24 *Microsoft Corp. v. i4i Ltd.*, — U.S. —, 131 S.Ct. 2238, 2242 (2011)). "Obviousness is
25 a question of law with underlying factual findings, including: (1) the scope and content
26 of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences
27 between the claimed invention and the prior art; and (4) objective evidence such as
28

---

which limitation that is. (ECF No. 8-1 ¶ 9.)

commercial success, long-felt need, and the failure of others." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).

While the patents-in-suit are presumptively valid, *Microsoft*, 131 S. Ct. 2238, 2242, the prior art cited by Defendants does raise some issues. At this stage, the Court notes that there appear to be some similarities between the Trimline Veterinary Recovery Collar and the patents-in-suit. For example, the Trimline is flexible, made of layered fabric, and returns to the e-collar shape, similar to the patents-in-suit. (*Compare* ECF No. 8-1, Ex. C *with* ECF No. 1-2, Exs. 1, 2, 3.) However, there may be appear to be some possible differences as well such as the number of the layers and the type of materials required by the '494 patent in comparison to the Trimline. Additionally, the description of the Trimline collar is vague and does not necessarily rise to the level of "clear and convincing evidence" required to prove invalidity. *Otsuka*, 678 F.3d at 1290. Accordingly, the Court finds that there is some evidence indicating that the patents-in-suit may be invalid.

Third, the Court turns to the actual infringement claims. To determine whether a design patent is infringed, the Court looks to whether "an ordinary observer, familiar with the prior art, would be deceived into thinking that the accused design was the same as the patented design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d at 681 (Fed. Cir. 2008). The D'502 patent shows an "ornamental design for a pet protective collar." D'502 Patent. Overall, the allegedly infringing products look quite similar to the D'502 patent. (*See* ECF No. 5-1, at 7–8.) They include some black attachments in the middle and on the side that are not claimed by the D'502 patent but they have they same general structure with regards to shape and form. Accordingly, the Court finds that Plaintiff has raised serious questions going to the merits of the D'502 infringement claim.

Turning to the regular patents, asserted Claim 9 of the '386 patent states:

A protective collar effective as a veterinary restraint when fitted on an animal, the protective collar comprising:

    a flexible assembly having an outer arcuate edge and an inner arcuate

>>edge and a first end and a second end;

>>at least one stay connected to the assembly and extending in a direction between the inner and outer arcuate edges, the stay formed of a material stiffer than that of the flexible assembly;

>>a plurality of channels each containing a stay, the channels at least partially extending between the inner arcuate edge and the outer arcuate edge of the assembly.

'386 Patent.

Plaintiff argues that all elements of Claim 9 are met by Defendants' products. (ECF No. 5-1, at 11.) Defendants do not respond to this argument. The images show a flexible protective collar with points at which the collar bends so that it may wrap around an animal's head. (ECF No. 5-3, Ex. 4.) However, many of the illustrated embodiments of the invention contain loops on the inner edge of the collar, *see* '386 Patent, Figs. 1, 3, 4, 10, 11, 12, and the allegedly infringing product does not appear to have these loops, (*see* ECF No. 5-3, Ex. 4). That said, the Court finds that, due to the similarities between the allegedly infringing products and the '386 patent, Plaintiff has shown serious questions going to the merits of the '386 infringement claim.

Asserted Claim 13 of the '494 patent states:

>A protective E-collar, comprising:

>>a layered assembly comprising;

>>>a first sheet comprising a flexible substantially non-resilient material having inner and outer arcuate edges extending between a first end and a second end of the first sheet;

>>>a second sheet comprising a flexible substantially non-resilient material and having a substantially similar shape to that of the first sheet;

>>>a flexible resilient padding layer, forming a generally similar shape to the first and second sheets located between said first and second sheets, such that when assembled the first and second sheets and the padding layer form the layered assembly having an outer arcuate edge and an inner arcuate edge and a first end and a second end;

>>>the first sheet and the second sheet and the padding layer between them being formed into the assembly by securing together the outer arcuate edges and the inner arcuate edges and the first and second ends of the first and second sheets;

>>a closure, effective to secure the first and second ends of the protective collar, such that when the first and second ends of the protective collar are secured, a closed configuration is formed having an inner opening and an outer opening, the inner opening being substantially smaller than the outer opening;
>
>>wherein only the inner opening of the two openings is adapted to fit securely around the neck of the wearer.

'494 Patent.

The parties dispute whether there is a flexible resilient padding layer in the allegedly infringing products. The evidence cited by Plaintiff, (ECF No. 5-3, Ex. 4 (images and descriptions of Defendants' products from online retailers)), does not, however, provide any support for the argument that such a layer exists in Defendants' products. While the images and descriptions do show that there are at least two layers, an outer and an inner layer, in Defendants' product, there is no evidence as to whether anything exists between those layers as is required by Claim 13 of the '494 patent. Accordingly, the Court finds that Plaintiff has not shown a likelihood of success on the merits on this infringement claim because Plaintiff has submitted no evidence showing that this element of Claim 13 is met by the allegedly infringing products.

**2. Unfair Competition**

Plaintiff does not cite a single statute or case in either its complaint or its ex parte application for a TRO that supports its unfair competition cause of action. (*See* ECF No. 1 ¶¶ ; ECF No. 5-1, at 14–16.) Even the precise type of unfair competition that Plaintiff is attempting to assert is unclear, i.e., whether Plaintiff is alleging unfair competition under the section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), or under any of a number of state unfair competition laws, *e.g.*, CAL BUS. & PROF. CODE § 17200. As Plaintiff has failed to assert even the basic legal theory that underlies its unfair competition cause of action, the Court finds that Plaintiff has failed to show a likelihood of success on the merits of its unfair competition cause of action.

Overall, the Court finds that Plaintiff has shown serious questions going to the merits on two of its four causes of action but has not made that showing with regards to its other two causes of action. Additionally, Defendant has presented evidence that

does attack the validity of the patents-in-suit, though the evidence does not necessarily meet the clear and convincing standard required by caselaw. Accordingly, the Court finds that the likelihood of success on the merits factor weighs slightly in Plaintiff's favor.

**B. Irreparable Harm**

The second factor is whether Plaintiff will suffer irreparable harm in the absence of a TRO. *Winter*, 555 U.S. at 20. Plaintiff argues that, because international buyers of retail pet products only visit the United States for one of the two major annual pet product trade shows per year, SuperZoo and Global Pet Expo, marketing the allegedly infringing products at SuperZoo will cause irreparable harm because it will impact sales of pet e-collars for the next year or so and Plaintiff would not be able to correct that damage until the 2016 SuperZoo or Global Pet Expo. (ECF No. 5-1, at 17; ECF No. 5-2 ¶¶ 26–32.) Defendants' brief does not respond to Plaintiff's claim of irreparable harm, (*see* ECF No. 8), but at oral argument argued that money damages would make Plaintiff whole, (ECF No. 10).

The primary basis for irreparable harm appears to be Plaintiff's concern that Defendants will make damaging statements regarding Plaintiff's products, as Contech had in the past. (*See* ECF No. 5-1, at 18.) However, Plaintiff requests a TRO preventing Defendants from marketing the allegedly infringing products, not one preventing Defendants from making damaging statements. (*Id.*) Though Plaintiff refers to these damaging statements as "sharp elbowed sales tactics" used by Defendants, (ECF No. 5-1, at 17), Defendants could still make these alleged statements to buyers at SuperZoo even were the Court to issue a TRO. Thus it is unclear how the requested TRO would actually prevent the harm that Plaintiff cites.[5] At oral argument, Plaintiff argued that buyers would be concerned over the strength of Plaintiff's patents if Plaintiff were

---

[5] The Court also notes that because any possible recurrence of these statements would not be prevented by the requested TRO, it is unnecessary to resolve the dispute between the parties as to whether Chad Gibson and Barrelli are in fact connected to Contech.

1  unable to obtain a TRO. (ECF No. 10.) However, Plaintiff has already obtained one
2  settlement with a license agreement in the previous lawsuit and has since diligently
3  defended its patents by suing Defendants within months of CS Tech's formation. In
4  light of Plaintiff's actions, no reasonable party could think that Plaintiff does not
5  diligently attempt to enforce its patent rights.

6        To the extent that Plaintiff is concerned with the business relationships that
7  Defendants may form at SuperZoo, the Court finds that Plaintiff has not presented any
8  evidence showing that this harm would be irreparable. Though the Federal Circuit has
9  recognized that "[h]arm to reputation resulting from confusion between an inferior
10 accused product and a patentee's superior product is a type of harm that is often not
11 fully compensable by money because the damages caused are speculative and difficult
12 to measure," Plaintiff has made no such showing here. *Reebok Intern. Ltd. v. J. Baker,*
13 *Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994). Indeed, Plaintiff even tacitly admits that any
14 damage can be rectified at the next SuperZoo or Global Pet Expo. (*See* ECF No. 5-1,
15 at 17 ("Thus, damage done at SuperZoo by defendants CS Tech US, Gibson and
16 Barrelli may be impossible to rectify for another nine to twelve months when Global
17 and SuperZoo 2016 roll back around.") (citation omitted).) As Defendants noted at oral
18 argument, (ECF No. 10), if Plaintiff is successful in this lawsuit, money damages can
19 compensate Plaintiff for any sales that occur because of any action Defendants end up
20 taking at SuperZoo. Accordingly, the Court finds that the irreparable harm factor does
21 not weigh in Plaintiff's favor.

22 **C. Balance of the Equities**

23       The third factor the Court assesses is the balance of the equities. *Winter*, 555
24 U.S. at 20. Plaintiff argues that Defendants "will suffer little harm if unable to display
25 their infringing ProCone/ZenCone product" at SuperZoo because they have other
26 products to sell at the trade show. (ECF No. 5-1, at 19.) Plaintiff also argues that
27 allowing Defendants to market the allegedly infringing products at SuperZoo will cause
28 Plaintiff to "suffer reputational harm" because buyers will purchase from Defendants

1  for the next nine to twelve months. (*Id.* at 20.) Plaintiff finally argues that allowing
2  Defendants to market their allegedly infringing products would "embolden[]" other
3  potential infringers. (*Id.*) Defendants respond that a TRO would "severely damage[]"
4  their company because it would prevent them from forming business relationships at
5  SuperZoo that they need to grow their start-up venture. (ECF No. 8, at .)

6      It is undisputed that Defendants' company, CS Tech, is newly registered. (ECF
7  No. 1 ¶ 65.) Though Plaintiff argues that Defendants have other products to sell, it is
8  unclear what portion of Defendants' business the allegedly infringing products
9  comprise. With regards to Plaintiff's alleged reputational harm, Plaintiff only points to
10 lost potential sales that may result from Defendants marketing their products rather
11 than how a TRO would help them avoid reputational harm. Additionally, Plaintiff's
12 arguments regarding future emboldening potential infringers is speculative and
13 unsupported by evidence. Accordingly, the Court finds that this factor does not weigh
14 in favor of Plaintiff and thus does not "tip sharply" in Plaintiff's favor.

15 **D. Public Interest**

16     The fourth factor is whether the requested TRO would be in the public interest.
17 *Winter*, 555 U.S. at 20. Defendants argue that, because the patents-in-suit are allegedly
18 invalid, public interest weighs against a TRO. (ECF No. 8, at 10.) However, as
19 discussed above, it is not clear that there is a strong case of invalidity based on the
20 evidence submitted by Defendants. Generally, this factor weighs in favor of a patent
21 holder unless there is "some critical public interest that would be injured by" a TRO.
22 *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1998). Defendants have
23 not cited any public interest outside of their argument that the patents are invalid.
24 Accordingly, the Court finds that this factor weighs in favor of Plaintiff as the holder
25 of a duly-issued patent.

26     Based on the above discussed factors, the Court finds that a TRO is not
27 appropriate. While Plaintiff has shown serious questions going to the merits on two of
28 its causes of action and the public interest weighs in Plaintiff's favor, Plaintiff has not

shown a likelihood of success on the other two causes of action, the balance of the equities do not tip sharply in Plaintiff's favor, and, most importantly, Plaintiff has not shown any irreparable harm. While close, the Court finds that, overall, these factors do not support issuing a TRO because any harm that Plaintiff alleges it may suffer can be repaired with money damages. Therefore, the Court DENIES Plaintiff's Ex Parte Application and thus also DENIES Plaintiff's request for an order to show cause why the TRO should be made permanent.

**E. Expedited Discovery**

Finally, Plaintiff requests expedited discovery to "confirm the identity of the Mexican manufacturer, find out how much inventory has already been imported and where it has gone, how much more remains, and the extent to which defendants Gibson and Barrelli were executing their plan for CS Tech US even while they were employed by Contech." (ECF No. 5-1, at 24.) Defendants do not respond to Plaintiff's request for expedited discovery.

Generally, under Federal Rule of Civil Procedure 26(d), parties "may not seek discovery from any source prior to the conference required by Rule 26(f)." Fed. R. Civ. P. 26(d)(1). In the Ninth Circuit, district courts generally use the "good cause" standard to determine whether pre-Rule 26(f) conference discovery should be allowed. *Apple Inc. v. Samsung Electronics, Co., Ltd.*, No. 11-cv-1846-LHK, 2011 WL 1938154, at *1 (N.D. Cal. May 18, 2011). In determining whether good cause exists, the Court considers: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *American LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009).

First, as the Court has denied Plaintiff's request for a TRO, there is no pending injunction. Second, Plaintiff's request is limited to concerns regarding a single importer of ProCones/ZenCones and Chad Gibson and Barrelli's involvement with CS Tech.

1  Third, Plaintiff requests expedited discovery to assist in amending its complaint and
2  drafting its preliminary injunction motion. (ECF No. 5-1, at 24.) Fourth, Plaintiff asked
3  for this discovery a mere two days after filing this lawsuit. (*Compare* ECF No. 1 *with*
4  ECF No. 5.) The Court finds that the factors do not warrant expedited discovery. In
5  light of the fact that the Court has denied Plaintiff's request for a TRO, the Court does
6  not find good cause for expedited discovery. Accordingly, the Court DENIES
7  Plaintiff's request for expedited discovery.

## V. CONCLUSION

Based on the reasons discussed above, **IT IS HEREBY ORDERED** that Plaintiff's Ex Parte Application for Temporary Restraining Order, Order to Show Cause, and Request for Expedited Discovery , (ECF No. 5), is **DENIED**.

DATED: July 21, 2015

HON. GONZALO P. CURIEL
United States District Judge